**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SONYA KEYES, | ) | CASE NO.  1:12-CV-1309 |
| o.b.o. C.A., | ) | |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Sonya Keyes ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying the

application of Plaintiff's grandson and legal ward, C.A. ("Claimant"), for Supplemental

Security Income ("SSI") under Title X VI of the Social Security Act, 42 U.S.C. § 1381 *et*

*seq.* ("the Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case

is before the undersigned United States Magistrate Judge pursuant to the consent of

the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set

forth below, the Commissioner's final decision is REVERSED and REMANDED for

proceedings consistent with this Memorandum Opinion and Order.

## I.    PROCEDURAL HISTORY

On September 12, 2008, Plaintiff filed an application for SSI on behalf of

Claimant.  (Tr. 10.)  The application was denied initially and upon reconsideration, and

Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.*)  On

November 2, 2010, an ALJ conducted Claimant's hearing.  (*Id.*)  Claimant was

represented by an attorney.  (*Id*.)  Plaintiff was the only witness to testify at the hearing.

(*Id*.)  On November 12, 2010, the ALJ found Claimant not disabled.  (Tr. 13-22.)  On

April 10, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's

decision became the Commissioner's final decision.  (Tr. 1.)

On May 24, 2012, Plaintiff filed a complaint on behalf of Claimant to challenge

the Commissioner's final decision.  (Doc. No. 1.)  On October 21, 2012, Plaintiff filed

her Brief on the Merits.  (Doc. No. 12.)  On December 5, 2012, the Commissioner filed

his Brief on the Merits.  (Doc. No. 13.)  Plaintiff did not file a reply brief.

Plaintiff asserts that substantial evidence supports the conclusion the claimant is

markedly limited in at least two domains of functioning and, therefore, is disabled.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Claimant was born on October 3, 1998, and was a school-age child on the date

Plaintiff filed his application for SSI, and an adolescent on the date of his administrative

hearing.  (Tr. 13.)  He had not engaged in substantial gainful activity at any time

relevant to the disposition of his application.  (*Id*.)

### B.    Medical Evidence

On May 25, 2007, Claimant was admitted to Laurelwood Hospital ("Laurelwood")

after he tried to jump from the roof of his house and from a moving car because he was

angry that he was not allowed to sit in the front seat of the family car.  (Tr. 265.)  Staff at

Laurelwood restarted Claimant on Concerta, and increased his Seroquel.  (Tr. 264.)

Psychiatrists at Laurelwood diagnosed him with bipolar affective disorder not otherwise

2

specified, attention deficit/hyperactivity disorder ("ADHD"), and conduct disorder of childhood onset.  (Tr. 263.)  During his stay at Laurelwood, Claimant focused on handling frustration and anger.  (Tr. 264.)  Claimant was discharged on May 31, 2007, denying homicidal or suicidal ideations, with instructions to follow up with his pscyhiatrist.  (*Id*.)  Laurelwood staff assigned him a "fair" prognosis.  (*Id*.)

In November 2007, a physician with the Center for Families and Children ("CFC")[1] prescribed Claimant Concerta and Seroquel.  (Tr. 368.)  On January 9, 2008, a CFC physician noted Plaintiff's report that Claimant's behavior had not improved, that he was "still very hyper" and irritable and was engaging in negative behaviors despite punishment.  (Tr. 365.)  The physician reported that Claimant had a blunted, dysthymic effect.  (*Id*.)  The physician discontinued Claimant's Seroquel, prescribed Risperdal, and instructed Claimant to continue taking Concerta.  (Tr. 366.)  Plaintiff and Claimant did not show for an appointment scheduled on February 13, 2008.  (Tr. 364.)

On April 21, 2008, a CFC physician noted Plaintiff's report that Claimant was "doing really well academically [and] behaviorally in the school [and] at home except [for] attitude."  (Tr. 363.)  On April 30, 2008, a CFC staff member noted Plaintiff's report that Claimant was calmer and more focused, but remained restless and fidgety and "picks on his peers."  (Tr. 362.)  She reported that Claimant's behavior was more controlled, except "for his verbally abusive mouth."  (*Id*.)  Claimant had recently been in a fight with another child at the Boys and Girls Club.  (*Id*.)  On that date, a CFC

---

[1]     The names and signatures of the CFC physicians who examined Claimant are not legible.

3

physician prescribed Remeron, an antidepressant.  (Tr. 368.)[2]

In a June 11, 2008 case note, a CFC staff member stating that, on May 30, 2008, the staff member had received a call from Plaintiff's therapist, reporting that Claimant was out of his medication, and that his behavior had been escalating, resulting in Claimant being suspended from school.  (Tr. 361.)  The staff member noted that Claimant had threatened and cursed at school staff.  (*Id*.)  CFC staff had instructed Plaintiff to take Claimant to the emergency room, but Plaintiff did not have transportation.  (*Id*.)  Claimant had run away from home for two or three hours, and had slept when he returned home.  (*Id*.)  According to the note, on May 31, 2008, Claimant was hyper and agitated, and had been disruptive during a weekend visit with his former foster mother, trying to break a window.  (*Id*.)  On June 11, 2008, a CFC physician increased Claimant's dosage of Remeron.  (Tr. 368.)

On June 18, 2008, Plaintiff and Claimant failed to show for a scheduled appointment at CFC.  (Tr. 360.)  Claimant's therapist noted that, "given [Claimant's] instability," he would "alert 696-KIDS" if Claimant missed his next appointment.  (*Id*.)

On July 23, 2008, Plaintiff reported that Claimant had been out of his medication when he had been disruptive at the Boys and Girls Club.  (Tr. 357.)  Claimant was "irritable, 'but better'" and slept better on his medication.  (*Id*.)  A CFC physician instructed Claimant to continue the Concerta, Remeron and Risperdal, and prescribed Ritalin to treat Claimant's ADHD symptoms.  (Tr. 358.)  The physician noted Claimant's

---

[2]     The addition of Remeron to Claimant's treatment regimen is not reflected in the CFC case note for April 30, 2008, but, rather, in the CFC medication sheet.  (Tr. 362, 368.)

4

"poor treatment adherence."  (*Id*.)

On August 11, 2008, a CFC physician noted that Claimant was complying with his medication regimen, but reported Plaintiff's complaint that Claimant had been acting defiant and had been kicked out of camp recently.  (Tr. 356.)  The physician increased Claimant's dosage of Risperdal.  (*Id*.)  Claimant and Plaintiff failed to show for a September 8, 2008 appointment at CFC.  (Tr. 355.)

On September 15, 2008, a CFC physician noted that Claimant was compliant with his medications, and continued to have behavior problems secondary to his ODD, including fighting and spitting.  (Tr. 354.)  On September 29, 2008, a CFC physician noted Plaintiff's report that Claimant was disruptive in class and on the bus, calling people names and being disrespectful.  (Tr. 353.)  The CFC instructed Plaintiff to: decrease Plaintiff's dose of Remeron until he was weaned off of it, discontinue the Risperdal, continue the Concerta and Ritalin, and begin taking Abilify.  (Tr. 353, 367.)

On October 29, 2008, when Claimant was in the fourth grade, B. Warne-Murphy, LISW-S, a counselor at Bellefaire Jewish Children's Bureau ("Bellefaire"), assessed Claimant.  (Tr. 321-35.)  She noted Claimant's history of suspensions from school and the school bus, aggressive behavior, poor peer relationships, making threats, fighting and destroying property.  (Tr. 321.)  She reported that Claimant had decreased impulse control, but an otherwise unremarkable mental status exam.  (Tr. 322-23.)  She noted that he was taking Abilify, Ritalin and Concerta.  (Tr. 330.)  Ms. Warne-Murphy diagnosed Claimant with ADHD (combined type), bipolar disorder and oppositional defiant disorder ("ODD").  (Tr. 331.)  She recommended that Claimant participate in anger management group therapy.  (Tr. 337.)

5

Throughout late 2008 and in January 2009, CFC physicians and staff reported that Claimant's behavior improved on Concerta, Ritalin and Abilify, noting that he had been calmer and that Plaintiff had not received any calls from Claimant's school regarding his behavior.  (Tr. 352 (October 6, 2008), 350 (November 17, 2008), 349 (December 15, 2008),348 (January 12, 2009).)  Claimant's academics improved (Tr. 350), and his mood was stable (Tr. 349).  Claimant's behavior at home had also improved.  (Tr. 348.)

On January 1, 2009, licensed social worker Stephanie Stedmire-Wails, LSW, completed a medical and functional equivalence questionnaire, in which she indicated that she was Claimant's therapist, but did not indicate when she began treating him. (Tr. 310.)  She opined that Claimant had: a marked limitation in acquiring and using information and in interacting and relating with others; and an extreme limitation in attending and completing tasks, and in his health and physical well-being.  (Tr. 310-12.) She noted that Claimant's disorder interfered with his functioning twice each month and "usually last[s] 30-45 minutes."  (Tr. 312.)  She stated, "Since I have been [Claimant's] therapist he has exhibited manic psychotic behavior, self abuse . . . when angry, poor social skills.  I have had client admitted to the hospital [three times]."  (Tr. 313.)

On February 2, 2009, a CFC physician noted Plaintiff's complaint that Claimant was acting up again at school and at home. (Tr. 347.)  He had been suspended from school for cursing.  (*Id*.)  The physician increased Plaintiff's dosage of Abilify and instructed him to continue taking the Concerta and Ritalin.  (*Id*.)  On March 2, 2009, Plaintiff reported that Claimant's behavior had improved since the last visit, and that his mood was more stable.  (Tr. 346.)

6

On June 25, 2009, Bellefaire psychiatrist Susan Frodyma, M.D., completed a medical and functional equivalence questionnaire, in which she indicated that she had been treating Claimant since May 1, 2009.  (Tr. 304.)  She opined that Plaintiff had: an extreme limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself; and a moderate limitation in his health and physical well-being.  (Tr. 304-06.)  She noted that Claimant "has extreme difficulty maintaining himself at home, school and at Bellefaire.  He needs constant supervision and often loses control of himself."  (Tr. 306.)  She stated that Claimant's "disorder interferes with his functioning daily."  (*Id.*)[3]

In May 2009, Quintin Putt, a qualified mental health specialist with the Positive Education Program ("PEP"),[4] noted Plaintiff's "confusion with [Claimant's] prescribed

---

[3]    In an undated letter, Bellefaire After School Program Clinical Supervisor Rob Lieberman, LISW-S, noted that Claimant had attended the Bellefaire after school program from October 2008 to May 2009.  (Tr. 240.) Claimant had been discharged from the program at the end of May 2009 "due to becoming an increased safety risk."  (*Id.*)  According to Lieberman, during his time in the program, Claimant had hit other students and staff, kicked an air conditioner out of window and climbed out of the window, left the facilities on multiple occasions, and been physically aggressive toward staff and other students, resulting in Claimant being physically restrained.  (*Id.*)

[4]    The administrative transcript reflects that Claimant began attending school and group therapy at PEP in August 2009.  (Tr. 467.)  An April 28, 2009 notation on Claimant's Individual Education Plan ("IEP") from Cleveland Heights-University Heights schools, where Claimant had been attending school, states "Interim educational setting beginning 8/28/09 until separate facility placement is secured."  (Tr. 387.)  Mr. Putt's notes regarding Claimant begin on May 19, 2009.  (Tr. 449.)  A July 2009 note from Mr. Putt reflects that Claimant was charged with "multiple assault charges obtained from his public school placement prior to starting day treatment at PEP."  (Tr. 454.)  Plaintiff testified that Claimant had been expelled from public school and placed in PEP.  (Tr. 35.)

medications," and "reviewed [Claimant's] prescribed med[ications] as documented by his doctor." (Tr. 451.) Mr. Putt advised Plaintiff to throw out Claimant's old medications so that she would not be confused about what to give him. (*Id.*) In August 2009, Mr. Putt noted Plaintiff's report that she had misplaced Claimant's medications, and that Claimant had not taken them for two weeks. (Tr. 455.) Mr. Putt assisted Plaintiff in obtaining refills for the medications. (*Id.*) On August 24, 2009, Claimant began attending group therapy at PEP three times per week. (Tr. 467-642.)

On September 21, 2009, Mr. Putt noted that he and Plaintiff had met with Dr. Frodyma to "access necessary evaluation for medications, as [Claimant] has not had [his] medications for at least three weeks. . . . Dr. Frodyma stated that she had written prescriptions for [Claimant] weeks ago but they were not picked up by family." (Tr. 458.) Mr. Putt "discussed the increased need for these medications as [Claimant] has had multiple incidents within school since being off his med[ications]." *Id.* Mr. Putt recommended that Plaintiff seek medication management assistance from a physician at PEP. (*Id.*)

On October 26, 2009, Dora L. Norton, M.D., a physician with PEP evaluated Claimant, who was then 11 years old. (Tr. 643-47.) She noted his history of angry outbursts and that his behavior interfered with his academics. (Tr. 643, 646.) Dr. Norton diagnosed Claimant with an unspecified mood disorder and ADHD. (Tr. 647.) She increased his dosage of Abilify and instructed him to continue taking Concerta. (*Id.*) On November 23, 2009, Dr. Norton noted that Claimant's mood was less angry and labile with Abilify, and that he was making academic, behavioral and social progress. (Tr. 445.) She made similar observations throughout early 2010. (Tr. 446

8

(February 8 and March 22, 2010), 447 (May 17, 2010), 448 (June 21, 2010).)  In February 2010, Dr. Norton noted that Claimant's mood "continues to be up and down but is under much better control than the beginning of the school year when he was off of the medications."  (Tr. 446.)

### C.    Information and Reports from Claimant's Schools

On April 7, 2008, school psychologist Bill Friedson, Ph.D., noted that Claimant had a full scale IQ of 85, and that testing revealed that his general intelligence fell within the low average range.  (Tr. 377.)   He noted that, in the past, there had been some concern about Claimant's fine motor skills and he had received occupational therapy, but that these issues "ha[d] not been a concern for the last couple of years."  (*Id*.)

On September 23, 2008, Claimant's teacher, Enid Gurney, completed a teacher questionnaire.  (Tr. 169-77.)  In the domain of acquiring and using information, Ms. Gurney determined that Claimant had a very serious problem: reading and comprehending written material; comprehending and doing math problems; expressing ideas in written form; recalling and applying previously learned material; and applying problem-solving skills in class discussions.  (Tr. 170.)  She indicated that Claimant had an obvious problem: comprehending oral instructions; understanding school and content vocabulary; providing organized oral explanations and adequate descriptions; and learning new material.  (*Id*.)  She opined that Claimant had a slight problem understanding and participating in class discussions.  (*Id*.)  Ms. Gurney noted that Claimant had "trouble paying attention and focusing for long periods of time," but that "medication is somewhat helpful."  (*Id.*)

9

In the domain of attending and completing tasks, Ms. Gurney determined that Claimant had a very serious problem: working at reasonable pace/finishing on time (daily).  (Tr. 171.)  He had a serious problem: paying attention when spoken to directly (daily); focusing long enough to finish an assigned activity or task (daily); refocusing to task when necessary (daily); organizing his own things or school material (daily); completing work accurately without careless mistakes (daily); and working without distracting others (daily).  (*Id*.)  Ms. Gurney opined that Claimant had an obvious problem: sustaining attention during play/sports activities (daily); carrying out multi-step instructions (daily); waiting to take turns (daily); and changing from one activity to another without being disruptive (daily).  (*Id*.)  Claimant had a slight problem carrying out single-step instructions.  (*Id*.)  Ms. Gurney noted that Claimant "tried but has such trouble following through."  (*Id*.)

In the domain of interacting and relating with others, Ms. Gurney opined that Claimant had a very serious problem expressing anger appropriately (daily), and a serious problem making and keeping friends (daily).  (Tr. 172.)  Claimant had an obvious problem: playing cooperatively with other children (daily); seeking attention appropriately (daily); asking permission appropriately (daily); following rules (daily); and interpreting the meaning of facial expressions, body language, hints and sarcasm (daily).  (*Id*).  Ms. Gurney concluded that Claimant had a slight problem: relating experiences and telling stories (daily); using language appropriate to the situation and listener (daily); introducing and maintaining relevant and appropriate topics of conversation (daily); taking turns in conversation (daily); and using adequate vocabulary

10

and grammar to express thoughts/ideas in general, everyday conversation (daily).  (*Id.*)

Ms. Gurney commented that Claimant was "a wonderful child when he is not agitated or

feeling upset.  Unfortunately he acts upset easily [and his] feelings are hurt easily.  (*Id.*)

Ms. Gurney opined that Claimant had no problems in the domain of moving about

and manipulating objects.  (Tr. 173.) In the domain of caring for himself, Ms. Gurney

noted that Claimant had a very serious problem: handling frustration appropriately

(daily); being patient when necessary (daily); using appropriate coping skills to meet the

daily demands of the school environment (daily); and knowing when to ask for help

(daily).  (Tr. 174.)  Claimant had a serious problem responding appropriately to changes

in his own mood (daily), and an obvious problem: using good judgment regarding

personal safety and dangerous circumstances; and identifying and appropriately

asserting his emotional needs.  (*Id.*)  Ms. Gurney noted that it was "unclear whether

medication is helpful.  Sometimes even w[ith] medication [Claimant] has a hard time

behaving."  (Tr. 175.)

A November 2008 Individual Education Plan ("IEP"), developed during Claimant's

fourth-grade year, noted that Claimant was performing at an early second grade level in

reading, needed to improve his reading comprehension skills, and was able to complete

some third grade mathematics without assistance.  (Tr. 385.)  Claimant required

supervision to reinforce positive peer reactions during less supervised times of the

school day, such as recess and lunch.  (*Id.*)  The IEP described Claimant as "very

emotional" and easily frustrated over small problems.  (Tr. 386.)

On January 6, 2009, Ms. Gurney completed a school activities questionnaire, in

which she stated that she had known Claimant for five years while he was a student at

11

Fairfax Elementary.  (Tr. 440-41.)  She observed that Claimant's attention span and concentration in class varied, depending on his mood and the situation.  (Tr. 440.)  She also observed that Claimant's ability varied in the following areas: following instructions, working independently of teacher supervision, understanding and completing assignments on time, and responding to criticism.  (*Id*.)  She noted that "learning has been difficult [for Claimant.]  He has made progress through the years with much help from family, school staff [and] outside counseling."  (*Id*.)  Ms. Gurney noted Claimant's history of tantrums, outbursts and suspensions at the school, but also observed that Claimant was "a loving child.  When he feels calm he gets along well w[ith] others."  (Tr. 441.)  She observed that his "moods can change quickly."  (*Id*.0

On June 3, 2009, Ms. Gurney completed a second school activities questionnaire.  (Tr. 438-39.)  She noted that Claimant had been "referred to a more restrictive placement."  (Tr. 438.)  She opined that Claimant had difficulty with his attention span and concentration, and in his ability to: follow instructions, work independently of teacher supervision, understand and complete assignments on time, respond to changes of routine, respond to criticism and progress in learning the skills involved in reading, writing and mathematics.  (*Id*.)  Ms. Gurney observed that Claimant "can be very aggressive" and "was in many fights with peers."  (Tr. 439.)  According to Ms. Gurney, Claimant "will yell and argue with teachers . . . hit walls, scream, swear [and] throw himself around."  (*Id*.)

A June 15, 2009 report of Claimant's IEP developed at PEP reflected that Claimant chose solitary activities rather than interacting with his peers, and became frustrated and had difficulty following directions when he was given negative feedback.

12

(Tr. 223.)  Claimant had below average test scores in reading, written language and mathematics.  (*Id.*)  The report indicated that Claimant had made "slow steady progress towards academic and behavioral goals."  (*Id.*)

PEP staff members placed Claimant in restraints in September and December 2009.  (Tr. 241, 245.)  On September 29, 2009, Claimant became upset and began to throw objects when a peer taunted him.  (Tr. 241.)  When staff intervened, Claimant bit a teacher on the hand.  (*Id.*)  PEP staff restrained Claimant on the floor until he calmed down and was able to discuss the incident.  (Tr. 241-42.)  Claimant was eventually "able to return to the group and avoid dangerous behavior."  (Tr. 242.)  On December 18, 2009, Claimant began to kick and hit PEP staff members who were trying to calm him after an altercation with another student.  (Tr. 245.)  Claimant was placed in a sitting restraint, where he remained until he became calm and "was able to express his feelings about the situation and talk about [a] positive solution to the problem.  (*Id.*)

On January 29, 2010, Claimant's instructor at PEP noted that he "continues to demonstrate extreme difficulty with paying attention and participating in academics. This interferes with academic progress."  (Tr. 232.)  Claimant earned a mark of "needs improvement" in: phonemic awareness/word recognition/fluency; vocabulary; class participation; written expression; and writing convention (grammar, rules).  (Tr. 233.)  On that same date, PEP staff members placed Claimant in a sitting restraint after he began hitting and kicking staff members who would not let him use the gymnasium.  (Tr. 249.) He eventually calmed down "and talked about alternative behaviors."  (*Id.*)

Notes from May and June 2010 reflect that Claimant participated in group therapy with other PEP students.  (Tr. 610-42.)  He was noted to be "an active member

13

of the group" (Tr. 610), who "admitt[ed] that he would like to do more fun things out of the [PEP] center with the group" (Tr. 618).  On June 8, 2010, PEP staff noted that Claimant "helped the group understand that it is important to express our feelings in a manner that keeps everyone safe."  (Tr. 630.)  On June 23, 2010, Claimant "shared that when a person is working with someone or in a group it is important to communicate feelings and thoughts.  He said that it is especially important for him to listen to other[']s ideas."  (Tr. 640.)

> ### D.    Agency Reports and Assessments

On August 16, 2006, agency consulting psychologist, David. V. House, Ph.D., examined Claimant.  (Tr. 258.)  Dr. House noted that Claimant was cooperative with mildly limited concentration and attention, slow pace and subdued mood.  (Tr. 260-61.) Claimant handled frustration adequately and responded appropriately to redirection. (Tr. 261.)  Dr. House opined that Claimant's speech was below his age and educational expectations in terms of content.  (*Id.*)  His speech was understandable, although he did exhibit "some rather odd 'R' phoneme generation."  (*Id.*)  Dr. House diagnosed Claimant with psychotic disorder, not otherwise specified.  (*Id.*)  He opined that Claimant's socialization, intellectual skills, motor skills, concentration and attention were between the first and fifth percentiles, and that his speech was in the fifth percentile due to content.  (*Id.*)

In a December 1, 2008 Childhood Disability Evaluation Form, agency consultant Bruce Goldsmith, Ph.D., opined that Claimant had less than marked limitations in: acquiring and using information, attending and completing tasks, and interacting and

relating with others; and no limitations in: moving about and manipulating objects, caring for himself, and health and physical well-being.  (Tr. 292-93.)  Dr. Goldsmith noted that Claimant's test scores placed him in the low average range, and that his psychiatrist and social worker noticed an improvement in Claimant's behavior with medication.  (Tr. 292.)

### E.    Hearing Testimony

At Claimant's November 2, 2010 administrative hearing, Plaintiff testified as follows:

Claimant was 12 years old and in the sixth grade.  (Tr. 33.)  Claimant had an IEP because he had "trouble understanding or reading," and needed "help with his homework."  (Tr. 35.)  He didn't pay attention in class and was "jittery, jumping around and so forth."  (*Id*.)  Claimant got into fights with his peers and would not obey classroom rules.  (*Id*.)  He had punched and bitten teachers.  (Tr. 36.)  He was receiving intense therapy at the school he was currently attending.  (Tr. 35-36.)  Plaintiff had not noticed any improvement with his behavior, however.  (Tr. 36.)

Claimant was taking Abilify and Concerta, and Plaintiff believed that he needed higher dosages to control his behavior.  (Tr. 36-37.)  Claimant "likes to nitpick.  It's picking, starting things.  He'll aggravate, aggravation, it's like . . . chaos."  (Tr. 38.)  "It's like this, you can put [Claimant] outside, there would be a bunch of kids outside playing and then the next five minutes you've got chaos."  (*Id*.)  Claimant had been arrested for assaulting a teacher in the fifth grade, and was placed on probation.  (Tr. 42.)

### III.    STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled if he has a

medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002) (per curiam).  There is a three-step analysis for determining whether a child-claimant is disabled.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Second, if the child is not engaged in substantial gainful activity, the Commissioner must determine whether the child suffers impairments or a combination of impairments that are "severe" and that are expected to result in death or have lasted or are expected to last for a continuous period of not less than 12 months.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Third, if the child suffers a severe impairment or combination of impairments that meet the Act's durational requirement, the Commissioner must determine whether they meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  If the child's severe impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the Listings, the child will be found disabled.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.

To determine whether a child's impairment functionally equals the Listings, the Commissioner assesses the functional limitations caused by the impairment in six

domains of functioning:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   Claimant was born on October 3, 1998.  Therefore, he was a school-age child on September 12, 2008, the date the application was filed, and is currently an adolescent.

2.   Claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3.   Claimant has the following severe impairments: Attention Deficit Hyperactivity Disorder (ADHD), Bipolar Disorder, and Oppositional Defiant Disorder (ODD).

4.   Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Claimant does not have an impairment or combination of impairments that functionally equals the listings.  Claimant has a less than marked limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and the ability to care for himself; and no limitation in the ability to care for himself, moving about and manipulating objects, and health and physical well-being.

17

6.      Claimant has not been disabled, as defined in the Act, since September 12, 2008, the date the application was filed.

(Tr. 13-22.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ.  *Id.*  However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.

### B.    Plaintiff's Assignments of Error

Plaintiff argues that the ALJ erred in failing to give controlling weight to the

18

opinion of Dr. Frodyma.  She also contends that there is insufficient evidence to support the ALJ's conclusions regarding Claimant's functional limitations.  The Court will address each argument in turn.

### 1.     Whether the ALJ Erred in Considering the Opinion Evidence in the Administrative Transcript

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

19

Here, Plaintiff argues that the opinion of Dr. Frodyma was entitled to controlling weight because she was Claimant's treating psychiatrist.  Dr. Frodyma opined that Plaintiff had extreme limitations in multiple domains of functioning.  (Tr. 304-06.)  The ALJ, however, assigned "little weight" to her opinion "because it was based on less than two months of treatment where the number of exams are not indicated and because her opinion is based on a period of time when [Claimant] was not consistently taking prescribed medication for ADHD and his behavior disorder."  (Tr. 15.)

A review of the administrative transcript reveals that substantial evidence supports the ALJ's decision to assign little weight to Dr. Frodyma's opinion.  As noted by the ALJ, in her response to the medical or functional equivalence questionnaire – which is the only evidence of Dr. Frodyma's opinion in the transcript – Dr. Frodyma did not indicate how many times she had treated or examined Claimant.  Nor did Claimant provide notes of Dr. Frodyma's evaluations or other tests.  Further, the administrative transcript supports the ALJ's observation that Dr. Frodyma offered her  opinion after treating Claimant for less than two months – May and June 2009 – and during a time when he was not receiving the correct dosages of his medication on a regular basis because his grandmother was confused about what medication she should be giving him.  (Tr. 451.)  The ALJ identified multiple reasons for declining to grant controlling weight to Dr. Frodyma's opinion, and substantial evidence supports each of the reasons.

Plaintiff argues that the ALJ erred in not relying on Ms. Gurney's opinions to assign greater weight to Dr. Frodyma's opinion.  According to Plaintiff, because Ms. Gurney's opinion is consistent with Dr. Frodyma's opinion, the ALJ should have assigned controlling weight to Dr. Frodyma's opinion.  Although Ms. Gurney's January

20

2009 and June 2009 questionnaire responses are, to some extent, consistent with Dr.

Frodyma's opinions, this fact does not necessitate remand in this case.  The ALJ based

his decision regarding the weight assigned to Dr. Frodyma's not on any inconsistency

between her opinion and the other evidence, but, rather, on other issues – the brief

length of her treatment and the fact that Claimant was not consistently receiving his

medication – that are not addressed by Ms. Gurney's responses.  Accordingly, nothing

in Ms. Gurney's opinions compels the conclusion that the ALJ erred in failing to grant

controlling weight to Dr. Frodyma's opinion.  Because substantial evidence supports the

ALJ's decision not to assign controlling weight to Dr. Frodyma's opinion, this argument

lacks merit.

Plaintiff further contends that the ALJ erred in not addressing either Ms. Gurney's

September 2008 teacher questionnaire (Tr. 169-76) or Ms. Stedman-Walls's January

2009 medical and functional equivalence questionnaire  (Tr. 310-13).  According to

Plaintiff, because the ALJ did not address these opinions in his decision, "the weight

that he gave these opinions cannot be determined."  (Plaintiff's Brief ("Pl. Br.") 15-16.)

Plaintiff asserts that these opinions "were very important in making a fair and full

evaluation of the claim."  (Pl. Br. 16.)  This argument is not well taken.  As a preliminary

matter, although an ALJ is required to *consider* all of the evidence in the record, he is

not required to *discuss* each item of evidence in her opinion.  *See, e.g., Thacker v.

Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss

every piece of evidence in the record for his decision to stand.")  Further, under Social

Security Ruling 06-3p, an ALJ is required to discuss only that information that is relevant

to the outcome of the case:

21

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent review to follow the adjudicator's reasoning, *when such opinions may have an effect on the outcome of the case.*

S.S.R. 06-3p, 2006 WL 2329939 at * 6 (S.S.A.) (emphasis added).  Although Plaintiff

argues that the opinions of Ms. Gurney and Ms. Stedman-Walls were important to the

outcome of the case, she fails to explain why, or how their opinions would have had an

effect on the outcome.  Accordingly, this argument lacks merit.

### 2. Whether Substantial Evidence Supports the ALJ's Conclusions Regarding Claimant's Functional Limitations

In determining whether the ALJ's factual findings are supported by substantial

evidence, courts must examine the evidence in the record taken as a whole and take

into account whatever in the record fairly detracts from its weight.  *See Wyatt v. Sec'y of*

*Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  A decision supported by

substantial evidence will not be overturned even though substantial evidence supports

the opposite conclusion.  *Ealy*, 594 F.3d at 512.  In this case, Plaintiff argues that, in

analyzing the domains of functioning, the ALJ provided inadequate reasoning and

support for his findings in the areas of acquiring and using information, interacting and

relating with others, attending and completing tasks, and caring for himself.  This

argument is well taken.

With respect to Claimant's functioning in the domain of acquiring and using

information, after describing the relevant regulations, the ALJ made the following

22

conclusion:

> [C]laimant has less than marked limitation[s] in acquiring and
> using information. [C]laimant is in special education and has
> an [IEP] for behavior.  In an evaluation . . .  school
> psychologist Bill Friedson, Ph.D., on or about April 7, 2008,
> stated that at age 6 [C]laimant was determined to have a full
> scale IQ of 85.  An education report stated this falls in the
> low average range and accurately reflected his current
> abilities.

(Tr. 18.)  The evidence cited by the ALJ to support his conclusion in this area does not

correspond to his finding that Claimant had a less than marked limitation in acquiring

and using information.  The ALJ does not explain how this evidence supports his

conclusion.  Nor does he cite to other evidence in the record that supports his finding

that Claimant had a less than marked limitation in this domain.  Further, although the

ALJ discussed much of the medical and other evidence in his decision – and assigned

weight to several of the opinions of Claimant's physicians and counselor – the ALJ did

not attempt to connect that evidence and the weight he assigned to those opinions to

his conclusions regarding Claimant's functioning in this domain.  In short, there is no

analysis or discussion of the evidence that would enable this Court to review the ALJ's

decision in any meaningful way.

The ALJ's conclusions regarding Claimant's limitations in the other domains of

functioning discussed in Plaintiff's Brief suffer from similar infirmities.  With respect to

Claimant's limitations in interacting and relating with others and in attending and

completing tasks, the ALJ cited to record evidence demonstrating that Claimant had

limitations in these areas, but failed either to explain how that evidence supported his

conclusion that Claimant had less than marked limitations in that area, or to identify

evidence that did support it.  With respect to Claimant's ability to care for himself, the ALJ concluded, without citing to *any* evidence, that Claimant had no limitations in that domain.  This is particularly troubling, given that the record is replete with evidence that Claimant had trouble controlling his emotions, and that he experienced violent outbursts, resulting in assaults on teachers, fighting with his peers, his expulsion from after school programs, and the use of restraints by PEP staff.  *See* 20 C.F.R. § 16.926a(k)(1)(iii) (noting that the domain of caring for one's self includes "employ[ing] effective coping strategies, appropriate to [the claimant's] age, to identify and regulate . . . feelings, thoughts, urges and intentions); 20 C.F.R. § 416.926a(k) (requiring the agency to consider "how well [the claimant] maintains a healthy emotional and physical state, including how well [he] get[s his] physical and emotional wants and needs met in appropriate ways; how [the claimant] cope[s] with stress and changes in [his] environment; and whether [he] take[s] care of [his] own health, possessions and living area").

Although the ALJ generally discussed Claimant's medical and school records in this case, he failed to connect the information in those records to his ultimate conclusions regarding Claimant's limitations.  Accordingly, in order to determine whether substantial evidence supports his conclusions in these areas, this Court would be required to search out the evidence that supports those conclusions and assume the ALJ relied on it.  That is not this Court's function.[5]  *See Sarchet v. Chater,* 78 F.3d 305,

---

[5]     The Commissioner argues that substantial evidence supports the ALJ's conclusions regarding Claimant's limitations, and cites to evidence in the record supporting each conclusion.  However, it is well established that "the courts may not accept appellate counsel's *post hoc* rationalizations

307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").  Without the context and analysis that supports the ALJ's conclusion, this Court cannot meaningfully review the ALJ's decision.  Accordingly, remand is necessary for the ALJ to provide sufficiently specific, clear and adequate reasons for his conclusions regarding Claimant's limitations in the relevant domains of functioning.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: February 4, 2013

---

for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) (citation omitted)).